VIRGINIA:

FILED
CIVIL INTAKE

IN THE CIRCUIT COURT OF THE COUNTY OF FAIRFAX
Civil Division

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

2011 10047

|  |  |
|---|---|
| FASTMETRIX, INC. | ) |
| Plaintiff, | ) |
| v. | ) |
|  | ) |
| ITT CORPORATION, | ) |
| SERVE:  CT Corporation System | ) |
| 4701 Cox Road, Suite 301 | ) |
| Glen Allen, VA 23060-6802 | ) |
| Defendant. | ) |
|  | ) |

Case No. _____

## COMPLAINT

Plaintiff FastMetrix, Inc. ("FastMetrix") brings this action against defendant ITT Corporation ("ITT"). In support of its Complaint, FastMetrix states as follows:

### Parties and Venue

1.      FastMetrix is an Alabama corporation with its principal place of business in Huntsville, Madison County, Alabama that is qualified to transact business in the Commonwealth of Virginia.

2.      ITT is a Delaware corporation that maintains an office in the City of Alexandria, Virginia.

3.      Venue is proper pursuant to §§ 8.01-262(3) and (4) of the Code of Virginia.

4.      Moreover, venue in this county was agreed upon by the parties as part of a contract titled "Subcontract Agreement No. NSTA2222.1237.01," which was executed by the parties on or about September 1, 2006.

## Factual Background

5.     FastMetrix is a small business that performs very specialized work related to precision optical systems. A significant part of FastMetrix's business relates to providing products and services to the federal government of the United States.

6.     ITT is a high-technology engineering and manufacturing company with more than 40,000 employees in offices located throughout the world. A significant part of ITT's business relates to providing products and services to the United States military and its allies.

7.     On or about April 14, 2005, ITT and FastMetrix entered into a teaming agreement (the "Teaming Agreement") in anticipation of ITT being awarded the National Geospatial-Intelligence Agency (NGA) InnoVision Omnibus Contract (hereinafter referred to as the "NGA/InnoVision Omnibus Contract") by the federal government. A true and correct copy of the Teaming Agreement is attached hereto as EXHIBIT A.

8.     The NGA/InnoVision Omnibus Contract required work to be performed related to three dimensional laser radar imaging and laser topographic mapping. Very few companies in the United States have the capabilities to perform such work.

9.     At the time that the NGA/InnoVision Omnibus Contract was announced for bid, ITT had very limited capability to perform such work and very limited past experience with which to demonstrate the capacity to perform such work. FastMetrix, however, specializes in three dimensional laser radar imaging and laser topographic mapping. As such, ITT and FastMetrix entered into the Teaming Agreement for the purpose of defining the relationship between the parties in anticipation of subcontracting the three dimensional laser radar imaging and laser topographic mapping work under the NGA/InnoVision

2

Omnibus Contract to FastMetrix. In exchange for the subcontract relationship offered by ITT, FastMetrix agreed to support the proposal to be submitted by ITT for the NGA/Innovision Omnibus Contract by allowing ITT to utilize the expertise, technology, equipment and credentials of FastMetrix.

10.     Under the Teaming Agreement, the parties agreed that FastMetrix

> will be responsible for all technical support, data analyses, architectural studies, systems engineering, configuration, modeling, simulation activities performed under the NGA/InnoVision Omnibus contract awarded to ITT that are related to three dimensional laser radar imaging and laser topographic mapping. In the event that ITT requires assistance in the execution of tasks under the NGA/InnoVision Omnibus contract relating to other laser remote sensing technologies, including but not limited to laser spectroscopy and laser vibrometry, then [FastMetrix] will be the preferred supplier of those services.

EXHIBIT A, Appendix A, p. 7.

11.     In 2006, ITT was awarded the NGA/InnoVision Omnibus Contract.

12.     On or about September 1, 2006, FastMetrix and ITT entered into a contract titled "Subcontract Agreement No. NSTA2222.1237.01" (hereinafter referred to as the "Subcontract"). A true and correct copy of the Subcontract is attached hereto as EXHIBIT B.

13.     Under the Subcontract, the parties agreed that FastMetrix is "responsible for **all** technical support, data analyses, architectural studies, systems engineering, configuration, modeling, simulation activities performed under the NGA/InnoVision Omnibus contract awarded to ITT that are related to three dimensional laser radar imaging and laser topographic mapping." EXHIBIT B, Article 5.4 (emphasis added).

3

14.   The parties further agreed that, "In the event that ITT requires assistance in the execution of tasks under the NGA/InnoVision Omnibus contract relating to other laser remote sensing technologies, including but not limited to laser spectroscopy and laser vibrometry, then [FastMetrix] will be the preferred supplier of those services." *Id.*

15.   The inclusion of the two provisions described above was of paramount importance to FastMetrix. It assured that ITT would not be able to obtain work that it had been unable to persuade the government that it was qualified to perform in the absence of FastMetrix's credentials and capabilities, without permitting FastMetrix to perform such work. So vital to FastMetrix was the inclusion of such language, that FastMetrix refused to enter into any prior versions of the Subcontract offered by ITT if the same was not included in the Subcontract.

16.   However, since the Subcontract was executed, ITT has employed at least four (4) individuals to perform work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract, despite these clear provisions in the Subcontract.  These employees include Brad Chambers, Sandor Dar, Ralston Mitchell and Steve Cooper.

17.   In addition, upon information and belief, ITT has subcontracted with Northrop Grumman Corporation ("Northrop Grumman") and OG Systems ("OGS") to perform work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract.

18.   By directing work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract to its own employees and to Northrop Grumman and OGS, ITT has breached Article 5.4 of the Subcontract.

4

19.   ITT has also used FastMetrix's expertise, technology and equipment for the benefit of itself and to the detriment of FastMetrix.  In doing so, ITT has diminished FastMetrix's competitive advantage and decreased its productivity and profitability.

20.   On or about October 3, 2008, Gary Kamerman ("Kamerman"), the President of FastMetrix, met with several senior ITT representatives in Alexandria, Virginia.  These included Craig Fauci, Joseph Pierce, Cornia Atcherson, Amy Galven and Susan Word.  At that time, Joseph Pierce was the ITT Program Manager responsible for the NGA/InnoVision Omnibus Contract.  Craig Fauci was his supervisor.

21.   During this meeting, Kamerman and the ITT personnel discussed the parties' interpretation of Article 5.4 of the Subcontract.

22.   Kamerman was clear in expressing to the ITT personnel his understanding that, under the Subcontract, FastMetrix was to be the exclusive provider of work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract.

23.   Since the meeting in October 2008, however, ITT has continued to direct work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract to its own employees and to other entities.  In doing so, ITT has continued to breach Article 5.4 of the Subcontract.

24.   With regards to disputes, the Subcontract provides as follows:

> The parties shall make a good-faith effort to amicably settle by mutual agreement any dispute that may arise between them under this Subcontract.  Except with respect to issues subject to Article 6.2, any claim, controversy or dispute arising out of or related to this Agreement shall be resolved exclusively in the courts of the commonwealth of Virginia located in Fairfax County, Virginia.  Any judgment issued by such court shall

5

award the prevailing party its reasonable attorneys' fees and related costs.

EXHIBIT B, Article 6.1.

25.     The parties have met this obligation by meeting about this dispute in October 2008. Kamerman has further satisfied this obligation by repeatedly requesting ITT to discontinue its disputed activities. As explained above, however, the parties were not able to come to an agreement on the dispute.

26.     FastMetrix has been and continues to be damaged by ITT's refusal to direct all work related to three dimensional laser radar imaging and laser topographic mapping performed under the NGA/InnoVision Omnibus Contract to FastMetrix.

## COUNT I - BREACH OF CONTRACT

27.     FastMetrix incorporates paragraphs 1 through 26 herein.

28.     On or about September 1, 2006, FastMetrix and ITT entered into the Subcontract.

29.     Under the Subcontract, the parties agreed that FastMetrix is "responsible for all technical support, data analyses, architectural studies, systems engineering, configuration, modeling, simulation activities performed under the NGA/InnoVision Omnibus contract awarded to ITT that are related to three dimensional laser radar imaging and laser topographic mapping." EXHIBIT B, Article 5.4.

30.     FastMetrix has been performing some work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract.

31.     FastMetrix has been ready, willing and able to perform *all* of the work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract. FastMetrix has performed *all* of the work relating to three dimension laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract offered by ITT.

32.     ITT, however, has directed work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract to its own employees and to other entities. By doing so, ITT has breached the Subcontract.

33.     FastMetrix has been damaged by ITT's breach of the Subcontract.

34.     These damages include, but are not limited to, the profits FastMetrix would have obtained by performing work under the Subcontract had ITT not breached it.

## COUNT II - BREACH OF FIDUCIARY DUTY

35.     FastMetrix incorporates paragraphs 1 through 34 herein.

36.     By the nature of their business relationships and the promises made by ITT to induce FastMetrix to become part of the team and allow ITT to use FastMetrix's expertise, technology and equipment, ITT owed certain fiduciary duties to FastMetrix.

37.     ITT also had a fiduciary duty to avoid placing itself in a position adverse to FastMetrix under the NGA/InnoVision Omnibus Contract.

38.     ITT also had a fiduciary duty to FastMetrix to safeguard the work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract for FastMetrix, as well as safeguard FastMetrix's expertise, technology and equipment.

39.   ITT breached its fiduciary duties to FastMetrix by, among other things, using FastMetrix's expertise, technology and equipment for the benefit of itself and/or other entities.

40.   The above-described actions were taken in bad faith, lacked the duty of care, and were contrary to the best interests of FastMetrix.

41.   The above-described actions were also willful and wanton, and/or conducted with actual malice.

42.   As a direct and proximate result of ITT's actions, FastMetrix has suffered substantial damages including those resulting from lost profits, diminished competitive advantage and decreased productivity and profitability.

43.   ITT's actions were taken willfully, intentionally, wantonly, maliciously and with intent to injure and/or oppress FastMetrix, thereby entitling FastMetrix to punitive damages.

## COUNT III - UNJUST ENRICHMENT

44.   FastMetrix incorporates paragraphs 1 through 43 herein.

45.   FastMetrix conferred a benefit on ITT by using its expertise, technology and equipment to perform work related to three dimensional laser radar imaging and laser topographic mapping under the Subcontract.  ITT had only limited capabilities to perform such work until FastMetrix began performing work under the Subcontract.

46.   ITT knew that FastMetrix conferred this benefit under the Subcontract.

47.   ITT, by directing work related to three dimensional laser radar imaging and laser topographic mapping under the Subcontract to its own employees, retained the benefits conferred by FastMetrix under the Subcontract without paying for them.

8

48.     ITT has been unjustly enriched by inequitably retaining FastMetrix's expertise, technology and equipment related to three dimensional laser radar imaging and laser topographic mapping.

49.     As a direct and proximate result of ITT's actions, FastMetrix has suffered substantial damages, including those resulting from lost profits, diminished competitive advantage and decreased productivity and profitability.

## COUNT IV - DECLARATORY JUDGMENT

50.     FastMetrix incorporates paragraphs 1 through 49 herein.

51.     Under the Subcontract, the parties agreed that FastMetrix is "responsible for all technical support, data analyses, architectural studies, systems engineering, configuration, modeling, simulation activities performed under the NGA/InnoVision Omnibus contract awarded to ITT that are related to three dimensional laser radar imaging and laser topographic mapping." EXHIBIT B, Article 5.4.

52.     A justiciable controversy exists between the parties as FastMetrix is informed and believes that ITT has not abided by and does not intend to abide by Article 5.4 of the Subcontract.

53.     Pursuant to the Virginia Declaratory Judgment Act, §§ 8.01-184 to 191 of the Code of Virginia, FastMetrix respectfully requests this Court to declare the rights, privileges and/or entitlements of the parties with respect to Article 5.4 of the Subcontract.

WHEREFORE, FastMetrix requests the following relief:

1.      Award Plaintiff, FASTMETRIX, INC. a judgment against ITT CORPORATION in the amount of EIGHT MILLION DOLLARS ($8,000,000.00) for its compensatory damages;

9

2.      Award Plaintiff, FASTMETRIX, INC. a judgment against ITT CORPORATION in the amount of THREE HUNDRED AND FIFTY THOUSAND DOLLARS ($350,000.00) for punitive damages;

3.      Enter an order declaring that FastMetrix is the exclusive provider of work related to three dimensional laser radar imaging and laser topographic mapping under the NGA/InnoVision Omnibus Contract pursuant to §§ 8.01-184 to 191 of the Code of Virginia;

4.      Award Plaintiff, FASTMETRIX, INC. a judgment against ITT CORPORATION for its attorney's fees;

5.      Award Plaintiff, FASTMETRIX, INC. a judgment against ITT CORPORATION for prejudgment and postjudgment interest;

6.      Award Plaintiff, FASTMETRIX, INC. a judgment against ITT CORPORATION for its costs;

7.      For any such other and further relief the Court deems necessary.

A JURY TRIAL IS HEREBY DEMANDED

FASTMETRIX, INC.

By: _____

Counsel

Scott A. Surovell, Esq., VSB #40278
Nathan D. Rozsa, Esq., VSB #77268
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone 703.251.5400
Facsimile 703.591.9285
Counsel for FastMetrix, Inc.

G. Bartley Loftin, III, Esq.
Christopher S. Kuffner, Esq.
**MAYNARD, COOPER & GALE, P.C.**
655 Gallatin Street, S.W.
Huntsville, Alabama 35801
Telephone 256.551.0171
Facsimile 256.512.0119
gbloftin@maynardcooper.com
ckuffner@maynardcooper.com

## Listing of Attached Exhibits

EXHIBIT A   Teaming Agreement (Apr. 14, 2005).

EXHIBIT B   Subcontract Agreement No. NSTA2222.1237.01 (Sept. 1, 2006).

11

ITT Industries
Alexandria, VA

## TEAMING AGREEMENT

This Teaming Agreement, made and entered into this 14th day of April, 2005, by and between Advanced Engineering & Sciences, a Division of ITT Industries, Inc. having a place of business at 2560 Huntington Avenue, Alexandria, VA 22303 (hereinafter referred to as Prime Contractor) and FastMetrix, Inc., having a place of business at P.O. Box 14208, Huntsville, Alabama, 35815, (hereinafter referred to as Subcontractor).

### WITNESSETH

WHEREAS, the Prime Contractor may submit a proposal to the Federal Government (the "Government") in response to NGA Solicitation No. ▓▓▓ pertaining to InnoVision Omnibus Support (hereinafter referred to as the "Project"); and

WHEREAS, the Prime Contractor and the Subcontractor, because of their diverse, individual and complementary capabilities and experience have determined that a teaming arrangement between their respective organizations will develop the best management and technical approach to the Project; and

WHEREAS, this Agreement is entered into to enable each party to utilize the other party's capability and experience in areas of work which are uniquely available within the respective companies; and

WHEREAS, the Prime Contractor and the Subcontractor have agreed as set forth in the attached Appendix "A" hereof to a division of work responsibilities covering work to be performed by each party for the Project; and

WHEREAS, the Prime Contractor desires to have the Subcontractor participate in the proposal effort for the Project and will award a subcontract in accordance herewith to the Subcontractor if a prime contract is awarded to the Prime Contractor as a result of the proposal;

NOW, THEREFORE, in consideration of the mutual promises hereinafter contained, the parties hereto agree as follows:

1.  **SUPERSEDING EFFECT**

    This Agreement contains all of the agreements, representations, and understandings of the parties and supersedes all prior oral and written agreements, communications and documents between the parties with respect to the subject matter hereof.

    This Agreement shall not be amended or modified, nor shall any waiver or any right hereunder be effective unless set forth in a document executed by duly authorized representatives of both parties.

2.  **RELATIONSHIP OF THE PARTIES**

    (a)    Advanced Engineering & Sciences, a Division of ITT Industries, Inc. shall be the Prime Contractor and FastMetrix, Inc. shall be a Subcontractor in performance of the work. Subcontractor will not independently prepare or submit a proposal, either as a prime contractor or subcontractor, for the Project, nor will Subcontractor enter into agreements or provide services to anyone else which may adversely affect the award of this Project to the Prime Contractor. The program may require additional team members for various aspects of the work. The Prime Contractor shall, at its discretion, add additional members to the team or award subcontracts to such additional members as is determined to be necessary to be successful in obtaining an award for the Prime Contract.

    (b)    This Agreement is not intended by the parties to constitute or to create a joint venture, partnership, or formal business organization of any kind, other than a contractor team arrangement similar to that contemplated by FAR 9.601. The rights and obligations of the parties shall be only those expressly

-1-



EXHIBIT

A

set forth herein. Neither party shall have authority to bind the other except to the extent authorized herein. The Prime Contractor and Subcontractor shall remain as independent contractors at all times, the employees of one shall not be deemed to be the employees of the other, and neither party shall act as the agent for the other. Nothing herein shall be construed as providing for the sharing of profits or losses arising out of the efforts of either or both of the parties.

3.   PRIME CONTRACTOR RESPONSIBILITIES

If the Prime Contractor submits a proposal for the Project, the Prime Contractor shall:

(a)   Act as the leader in the preparation, submission, and negotiation of the proposal and be responsible for the final graphic arts, printing, binding, and delivery of the proposal. The Prime Contractor will have the sole right to determine the form, content and pricing of the final proposal.

(b)   Act as the contact with the Government for all matters concerning the proposal. If the Subcontractor receives any inquiries from the Government concerning the subject matter of this Agreement, the Subcontractor's response shall be coordinated in advance with the Prime Contractor. The Prime Contractor's presentations to the Government shall be coordinated with the Subcontractor to the extent that they relate to the Subcontractor's area of work as identified in Appendix A hereto.

(c)   Make appropriate recognition of the Subcontractor as a subcontractor for the Project for the work responsibilities set forth in Appendix A.

(d)   Designate in writing one individual within its organization to act as Proposal Manager with responsibility to direct performance of all proposal functions.

4.   SUBCONTRACTOR RESPONSIBILITIES

(a)   The Subcontractor shall:

(1)   Furnish the Prime Contractor, in a timely manner, in the form of a proposal prescribed by the Prime Contractor for incorporation into the prime proposal, material pertinent to the work identified in Appendix A including, but not limited to manuscripts, art work, and pricing data and, to the extent requested by the Prime Contractor, will cooperate in preparing the prime proposal. Should the Subcontractor choose not to fully disclose their pricing data to the Prime Contractor, the subcontractor shall prepare a separate fully disclosed proposal package (sealed and marked "Fully Disclosed: For Government Eyes Only") and submit this with their proposal to the Prime Contractor. Subcontractor's proposal will be furnished to the Prime Contractor no later than fourteen [14] days prior to the due date for the prime proposal, or as mutually agreed.

(2)   Provide qualified management and technical personnel when and where requested by the Prime Contractor to participate in the preparation, presentation, and negotiation of the proposal with the Government.

(3)   Designate in writing one individual within its own organization to act as Proposal Manager with responsibility to direct performance of its assigned proposal functions.

(b)   Proposal Pricing - Prior to the submission of Subcontractor's proposal to the Prime Contractor, the parties will discuss the Prime Contractor's pricing strategy which, in the Prime Contractor's judgment, is necessary for the parties to submit a competitive price proposal. If after good faith negotiations the Subcontractor is unable or unwilling to conform its pricing to such strategy, the Subcontractor will so advise the Prime Contractor of that assessment at the earliest opportunity prior to the date scheduled for the Subcontractor's proposal submission. In such event, the Prime Contractor may elect to

-2-

terminate this Agreement in accordance with paragraph 7(f) hereof. The Prime Contractor agrees that it shall not make any changes to the Subcontractor's proposed prices in the Prime's submission to the Government without first obtaining the Subcontractor's written authorization. Subcontractor agrees to submit to the Prime Contractor, in support of its proposal, pricing data in sufficient detail as may be required to allow the Prime Contractor to negotiate a subcontract with Subcontractor and to support negotiation of the prime contract. Cost data that is considered proprietary may be submitted directly to the Government as may be required. Examination of Subcontractor's books and records, if necessary, shall be reserved for authorized representatives of the Customer's Contracting Officer (which shall not include the Prime Contractor). Should the Prime Contractor's fact finding or negotiation with the Government raise specific issues with any aspect of the Subcontractor's proposal which impact proposed cost, Subcontractor agrees to negotiate in good faith to resolve those issues. Subcontractor further agrees to provide capable personnel to support the Prime Contractor in defending the Subcontractor's basis-of-estimate to the Customer as reasonably required by the Prime Contractor.

5.    PROPOSAL COSTS AND LIABILITIES

Unless specifically addressed elsewhere in this Agreement, each party shall bear all costs, risks, and liabilities incurred by it arising out of its obligations and efforts under this Agreement during the pre-proposal and proposal periods, which are defined as the periods up to the award of a prime contract. However, the Prime Contractor shall be responsible for the graphic arts, printing, binding and delivery costs of the proposal. Neither party shall have any right to any reimbursement, payment, or compensation of any kind from the other during the period up to the award of a prime contract.

6.    SUBCONTRACT TERMS

In the event the Prime Contractor should receive award of a prime contract as a result of the submission of the proposal, which prime contract contains the scope of work identified in Appendix A to this Agreement, the Prime Contractor will award a subcontract upon the terms and conditions noted below to Subcontractor for such scope of work, and at the proposed price submitted by the Subcontractor for submission to the Government. Subcontractor agrees to accept such subcontract which, at a minimum, shall enforce the same terms and conditions contained in the prime contract (except that the time within which notice must be given by the Subcontractor for a claim or appeal will be reduced by a sufficient number of days to allow the Prime Contractor to prepare its submission to the Government, and except for such other changes which might logically flow from it being a subcontract rather than a prime contract.) It is further understood that the Prime Contractor may be directed by the Government to place the work contemplated as the Subcontractor's responsibility to another source or to direct that such work be bid on a competitive basis; in either case, it is agreed that the Prime Contractor shall comply with the Government's direction.

7.    TERMINATION

This Agreement and all rights, duties, and obligations arising hereunder, except those relating to patents and proprietary information, will terminate upon the occurrence of the first of any one of the following events:

(a)    in the event the prime contract bid or proposal is rejected or not accepted by the Government within the time specified in the solicitation, or any extension established by the Government or otherwise agreed to by the parties;

(b)    formal cancellation or withdrawal of the solicitation for the Project by the Government;

(c)    definitive award of a prime contract for the Project to a contractor other than the Prime Contractor;

(d)    failure of the Prime Contractor to obtain Government consent to utilize Subcontractor for the scope of work identified in Appendix A;

(e)    deletion or substantial reduction by the Government from the Project of the scope of work assigned to Subcontractor identified in Appendix A;

(f)    failure of the parties to agree on the price of Subcontractor's work after good faith efforts during the proposal process or subsequent negotiations;

(g)    written notification to Subcontractor by the Prime Contractor of the Prime Contractor's decision not to submit a proposal for the Program;

(h)    written agreement of the parties;

(i)    30 April 2006, if not terminated earlier pursuant to (a)-(h) above;

(j)    award of a subcontract to Subcontractor for the work identified in Appendix A, or as the parties otherwise mutually agree;

(k)    organizational conflict(s) of interest relating to the program of either the Prime Contractor or Subcontractor, or personal conflicts of interest relating to the program which involve key employees or consultants of either the Prime Contractor or Subcontractor; provided that such conflict(s) of interest cannot be eliminated or mitigated to the satisfaction of the affected Government customers through reasonable actions by the companies.

8.    **SCOPE OF AGREEMENT**

During the period of this Agreement the Subcontractor will not enter into a teaming agreement with any other company for the same Project contained in this Agreement. However, nothing contained herein shall be construed as affecting the right of the Government to negotiate and contract directly with either party hereto on any basis that the Government may desire, nor shall either party be restricted from quoting, offering to sell, or selling to others any standard items or services which it regularly offers for sale and which may be included in the proposal contemplated by this Agreement, nor from marketing efforts to promote further evolution and application of such items or services. If, for any reason, a proposal for the Project is not submitted by the parties or if a contract for the Project is not awarded to the Prime Contractor, then each party shall be free to participate with any others who are awarded a contract for the Project by the Government.

9.    **ASSIGNMENT**

This Agreement may not be assigned or otherwise transferred by the Subcontractor in whole or in part without the express prior written consent of the other party.  Such consent will not be unreasonably withheld.

10.    **PUBLICITY**

Any news releases, public announcement, advertisement or publicity released by either party concerning this Agreement, or any proposal under this Agreement, or any resulting contract or subcontract to be carried out hereunder, will be subject to prior approval of the other party, except that this Agreement and the terms hereof may be made known to the U.S. Government.  Any such publicity shall give due credit to the contribution of each party.

11.    **DISPUTES**

Any disputes arising under this Agreement solely between the Prime Contractor and the Subcontractor shall be governed by the body of statutory, case law, and common law known as Government contracts law, or if the dispute does not involve issues of Government contracts law, then the laws of the Commonwealth of Virginia shall apply.  Any

-4-

dispute between the parties arising under or related to this Agreement shall first be subject to resolution by mutual agreement of the Parties. Accordingly, if either Party believes a dispute exists that cannot be so resolved, it shall notify the other Party in writing and an authorized management representative of each Party shall meet to resolve the issue in person. Such representatives of each Party shall have the authority to resolve the dispute. If such meeting does not resolve the issue to the mutual satisfaction of the Parties, then either Party may commence litigation in a court of competent jurisdiction in the Commonwealth of Virginia.

12.    PROPRIETARY INFORMATION

The rights and obligations of the parties with respect to the disclosure and handling of proprietary information shall be as set forth in Appendix B to this Agreement.

13.    NON-SOLICITATION OF PERSONNEL

It is expressly agreed and understood that neither party will actively solicit for hire the personnel of the other party about whom such party learns or otherwise becomes aware as a result of this proposal process for the purposes of inducing them to join such party's employ during the course of this Agreement and any resultant subcontract, without the prior written agreement of such other party. Either party, however, may approach or have employment discussions with employees of the other party who respond to or apply for positions offered through the normal process of general public advertisement (including without limitation advertisement over the internet).

14.    NOTICES

All notices or other communications required by this Agreement shall be in writing and, unless changed by prior written notice, shall be directed as follows:

(a)    The Prime Contractor

Advanced Engineering & Sciences,
a division of ITT Industries, Inc.
2560 Huntington Avenue
Alexandria, VA 22303

Attn:  Roberta Comer, Sr. Contracts Manager

(b)    The Subcontractor

FastMetrix, Inc.
P.O. Box 14208
Huntsville, Alabama 35815

Attn:  Eugene A. Hitt

15.    GOVERNING LAWS AND REGULATIONS

All applicable Federal laws, regulations, statutes or orders apply to the activities of the parties pursuant to this Agreement. This includes but is not limited to the Foreign Corrupt Practices Act.

To the extent the obligations of the parties hereunder involve access to U.S. Government classified information, the provisions of applicable Federal Acquisition Regulations and the National Industrial Security Program Operations Manual shall apply.

Each Party acknowledges that any technical information disclosed hereunder may be subject to export control, and that in order to ensure compliance with appropriate Government regulations such as the International Traffic in Arms Regulations (ITAR), the Export Administration Regulations (EAR), etc, it may be necessary to obtain required approvals before disclosing such information to foreign nationals, businesses or governments. The disclosing Party shall be responsible for ensuring that any required approvals are obtained prior to the disclosure of technical information hereunder. The receiving Party shall not further disclose and /or re-export technical information without ensuring the appropriate approvals are obtained. If the receiving Party further discloses the technical information without obtaining the appropriate approvals the receiving Party shall indemnify and hold harmless the disclosing Party from all resulting claims, demands, damages, costs, fines, penalties, attorneys' fees and all other expenses.

16.    SEVERABILITY

If any term, provision, covenant, or condition of this Agreement is held invalid or unenforceable for any reason, the remainder of the provisions shall continue in full force and effect as if this Agreement had been executed without the invalid portion and the remaining provisions shall be interpreted to give force and effect to the intent of the Parties without the eliminated provision(s).

17.    ENTIRE AGREEMENT

This Agreement, including the Attachments referenced herein, incorporates, sets forth, and constitutes the entire understanding and Agreement of and among the Parties with respect to the subject matter hereof and supersedes all prior representations, or otherwise, except by an instrument in writing of subsequent date hereto duly executed by authorized representatives of the Parties. The paragraph headings herein are for convenience only and shall not limit in any way the scope of this Agreement.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year written above.

ITT Advanced Engineering & Sciences Division          FastMetrix, Inc.

BY: _Roberta Comer_ for          BY: _Eugene A. Hitt_
TYPED NAME:  Frank Pallante          TYPED NAME:  Eugene A. Hitt
TITLE:  Vice President, Director of Contracts          TITLE:  Vice President, Engineering

DATE: _____5/20/05_____          DATE: _20 May 2005_

-6-

## APPENDIX A

### Scope of Work to be Performed by Subcontractor

This Teaming Agreement between ITT Industries AES and Subcontractor delineates their agreements and mutual interests in the anticipated National Geospatial-Intelligence Agency (NGA), InnoVision Omnibus Contract in 2005. This contract may include tasks currently a part of multiple NGA contracts, including the Planning, Needs & Development Contract (PNaDC), Technical Services Contract (TSC) and Motion Imagery Support Services (MISS) contract, and other InnoVision tasks to be defined in the RFP. Specific allocation of tasks and labor will be negotiated after receipt of the RFP.

1. **Team Strategy**

It is mutually understood that this procurement will be based on the need for flexibility and technical competence by the ITT team as well as an ability to react quickly to expand and contract efforts as directed by NGA. The areas of interest include but are not limited to:
- Technical support for
  - o Fundamental R&D
  - o Information Technology (examples include ATR and ICA)
  - o MASINT based Sensors
  - o Field Tests
- Data Analysis
- Architectural Studies
- Systems Engineering
- Configuration Management
- Modeling and Simulation
- Scaleable network support
- Data base development and maintenance
- Enterprise application solutions

Subcontractor agrees to provide competitive rates and bid competitively priced, qualified individuals to support the NGA efforts in these areas. ITT AES agrees to provide the technical lead to NGA/InnoVision Omnibus and interface between each team member.

2. **ITT AES Responsibilities**

ITT AES will provide the structure for the success of this activity. ITT AES will provide the Management team and a single point of contact (Program Manager) for direct contractual interface with NGA. Each task lead is responsible to this Management team for successful performance of their effort. ITT AES will be the final arbiter for Technical Lead of each effort. The Technical Lead is responsible to the Program Manager for overarching issues associated with this effort.

3. **Subcontractor Responsibilities**

Subcontractor will be responsible for all technical support, data analyses, architectural studies, systems engineering, configuration, modeling, simulation activities performed under the NGA/InnoVision Omnibus contract awarded to ITT that are related to three dimensional laser radar imaging and laser topographic mapping. In the event that ITT requires assistance in the execution of tasks under the NGA/InnoVision Omnibus contract relating to other laser remote sensing technologies, including but not limited to laser spectroscopy and laser vibrometry, then the subcontractor will be the preferred supplier of those services. The subcontractor will assist ITT in the preparation of all documentation necessary to secure contract task orders that would benefit from the unique capabilities and services Subcontractor provides.

## 4. Program Management

ITT AES will work closely with Subcontractor to develop a close working relationship within the Team. Program reviews will be held twice yearly with all teammates to ensure a good faith effort is being made to meet the expectations of the work distribution agreements and responsibilities accepted by both parties. In addition to reviewing current programs and work distribution, future pursuits and areas of collaboration are to be discussed as well. Smaller program reviews will be held as well to discuss either individual programs or Prime/Sub issues and pursuits. It is understood that this agreement is for an unspecified work-share for Subcontractor, focused in the areas to be decided after receipt of the RFP.

## 5. Conflict Resolution

Each Team member shall designate in writing to ITT AES for dissemination to the other Team members, a Subcontractor Program Manager to handle the daily activities of contract support. The ITT AES Program Manager or his designated Task Lead will be responsible for establishing and maintaining the work schedules for all Team members. If several Subcontractor employees are assigned to a task order, then Subcontractor will designate in writing the head of the Subcontractor Team members to the ITT AES Program Manager. Should conflicts arise between the two parties over costs or work share that cannot wait for the twice-yearly Program review, then a meeting may be called by either party to elevate the discussions to the final level of resolution.

## APPENDIX B

1.      During the term of this Teaming Agreement, the parties hereto may exchange proprietary and/or confidential information including but not limited to performance, sales, financial, contractual and technical data (as defined in DOD FAR Supplement 252.227-7013). All such proprietary or confidential information shall be exchanged only between individuals designated in writing for this purpose by each party. Such information must be in writing and clearly marked on each page as proprietary or confidential, or if first disclosed orally, shall be declared as proprietary or confidential by written notice from the disclosing party to the receiving party within thirty (30) days of such disclosure, with such notice describing the proprietary or confidential information so disclosed..

2.      The receiving party, during the term of this Teaming Agreement and for five years thereafter, shall hold such information in confidence, shall use such information only for the purposes of this Teaming Agreement and shall not disclose such information to any third party without prior written approval of the other party, except that all such information may be disclosed to the Government for the purpose of this Teaming Agreement if such information is required in accordance with FAR 52.215-12 and marked with the appropriate restrictive legend.

3.      Neither party shall be liable for the inadvertent or accidental disclosure of proprietary or confidential information if such disclosure occurs despite the exercise of the same degree of care as such party normally takes to preserve its own such proprietary or confidential information, and in any event, not less than reasonable care. These restrictions on the use and disclosure of information marked as proprietary or confidential shall not apply to information:

      (i)      independently developed by the receiving party prior to the disclosure by the other party, or lawfully received from another source without breach of this Teaming Agreement;

      (ii)     published or otherwise legally coming within the public knowledge or public domain, without breach of this Teaming Agreement by the receiving party;

      (iii)    previously known by the receiving party independently of the disclosing party;

      (iv)    received from a third party without a duty of confidentiality; or

      (v)     disclosed with the written approval of the other party.

4.      Any information, other than proprietary or confidential information identified as provided above, shall not be restricted by either party as to the other party's use thereof.

5.      No license to the other party under any trademark, patent or copyright, or any applications therefore, which are now or may thereafter be owned by a party is either granted or implied by the conveying of information to such other party. None of the information which may be submitted or exchanged by the parties shall constitute any representation, warranty, assurance, guarantee or inducement by either party to the other with respect to the infringement or non-infringement of trademarks, patents, copyrights, or any rights of privacy, or other rights of third persons.

6.      Inventions arising out of this proposal effort that are solely conceived or reduced to practice by one of the parties hereto shall remain the property of the originating party. Inventions arising out of this proposal effort that are jointly conceived or jointly reduced to practice by the parties hereto shall be subject to further negotiations between the parties in order to establish their respective rights. This understanding is subject to the rights of the U.S. Government, if any.



# ITT

## SUBCONTRACT AGREEMENT
### No. NSTA2222.1237:01

This Subcontract Agreement ("Agreement" or "Subcontract"), effective as of the 1st day of September 2006 (Effective Date), between ITT Corporation, Advanced Engineering & Sciences Division, with offices at 2560 Huntington Avenue, Alexandria, Virginia 22303 ("Prime Contractor," "Prime" or "ITT AES") and FastMetrix, Inc., with offices at P.O. Box 14208, Huntsville, AL 35815 (the "Subcontractor") (collectively, the "parties") consists of:

| | |
|---|---|
| Section A - Parties and Services, | Section D - Special Provisions, |
| Section B - Terms and Conditions, | Section E - Contract Clauses, |
| Section C - Pricing and Payment, | Section F - Attachments |

WHEREAS, ITT AES has been awarded Contract No. 2006*1169118*000, for Innovision Research and Development (hereinafter known as "GeoSage"); and

WHEREAS, Subcontractor has been selected as a member of the team to provide services to the Government pursuant to the above referenced and has certain capabilities required by the Prime Contract;

NOW THEREFORE, in consideration of the mutual covenants, agreements, and promises set forth herein, the parties agree as follows:

## SECTION A - PARTIES AND SERVICES

1. Subcontractor agrees to provide services to ITT AES in accordance with the terms and conditions of this Subcontract.
2. The parties agree that ITT AES's ability to allocate work to Subcontractor is dependent on: (a) the total amount of work actually ordered by the Government, and (2) satisfactory performance of work by Subcontractor in accordance with the terms and conditions of the Agreement. Subcontractor and ITT AES have agreed that ITT AES may assign Subcontractor to work in any area that the Government has tasked ITT AES to perform under the aforementioned Prime Contract. The Subcontractor shall perform tasking per the Statement of Work specified in each Task Order issued pursuant to this Subcontract.
3. The Subcontract type is: _____CPFF_____
4. The total estimated cost is identified as the sum of the value on the individual Task Orders.
5. The period of performance of this Subcontract is 1 September 2006 thru 30 November 2011 unless otherwise earlier terminated or extended.
6. The respective points of contact for the parties regarding contractual or program issues are set forth in Section B, Article 3.

Business classification – Subcontractor certifies that it is a ☐-large business ☒-small business ☐-small disadvantaged business ☐-woman-owned small business ☐-historically black college or university ☐-minority institution ☐-HUB zone ☐-8(a)-certified ☐-veteran-owned ☐-service disabled veteran-owned ☐-other

IN WITNESS WHEREOF, the parties by their duly authorized representatives have executed this Agreement on the Effective Date first written above:

| FastMetrix, Inc. | ITT CORPORATION, |
|---|---|
| P.O. Box 14208 | ADVANCED ENGINEERING & SCIENCES DIVISION |
| Huntsville, AL 35815 | 2560 Huntington Avenue |
| | Alexandria, VA 22303 |
| By: *Gary W. Kamerman* | By: *Roberta Comer* |
| Printed Name: *Gary W. Kamerman* | Printed Name: Roberta Comer |
| Title: *President* | Title: Sr. Contracts Manager |



EXHIBIT
B

AES 2006-08



## SECTION B - TERMS AND CONDITIONS

1. Relationship of the Parties. This Agreement does not establish a joint venture, partnership or any other formal business organization between the parties except for the relationship set forth herein. Unless otherwise agreed, neither party may act as the agent of the other party for any purpose whatsoever.

   Each party shall pay all labor compensation and benefits due its respective employees relating to this Agreement and shall be responsible for all obligations respecting such employees relating to income tax, FICA and Medicare withholdings, unemployment taxes, pension and retirement plan contributions, and other similar responsibilities.

2. Minimum Guarantee. The minimum guarantee under this Subcontract is equal to the funded value of the first Task Order issued pursuant to this Subcontract. Subcontractor acknowledges and agrees that other than what is necessary to comply with the requirements of the minimum guarantee, ITT AES is not obligated to issue any Task Orders to Subcontractor or extend the performance period on or add funding to any Task Order already issued.

3. Designation of Program Managers and Contracts Representatives. The parties designate the following persons as their respective contractual and program points of contact. Subcontractor agrees to take technical direction concerning the services to be performed under this Agreement solely from ITT AES's Program Manager. Any direction given by ITT AES's Program Manager shall not constitute a change to this Subcontract. Any and all changes to this Subcontract, or to any Subcontract Task Order issued hereunder, to be effective, shall be in writing and signed by ITT AES's Subcontract Administrator. Each party may change these designations from time to time by providing notice of such change in accordance with the notice provision set forth at Section B, Article 15.

3.1. The Subcontractor's technical point of contact for this subcontract is:

Name      Gary Kamerman
Address   PO Box 14208

|         |                  |
|---------|------------------|
|         | Huntsville, AL 35815 |
| Email   | gwk@fastmetrix.biz |
| Phone   | 256-881-5558     |
| Fax     | 256-881-0087     |

3.2. The Subcontractor's contract point of contact for this subcontract is:

| Name    | Brianna Grimm    |
|---------|------------------|
| Address | PO Box 14208     |
|         | Huntsville, AL   |
| Email   | bhg@fastmetrix.biz |
| Phone   | (256) 881-5558   |
| Fax     | 256-881-0087     |

3.3. ITT AES's Program Manager for this subcontract is:

| Name    | John Pace        |
|---------|------------------|
| Address | 2560 Huntington Ave |
|         | Alexandria, VA 22303 |
| Email   | john.c.pace@itt.com |
| Phone   | 703-329-7115     |
| Fax     | 703-960-7047     |

3.4. ITT AES's Subcontract Manager for this subcontract is:

| Name    | Roberta Comer    |
|---------|------------------|
| Address | 2560 Huntington Ave |
|         | Alexandria, VA 22303 |
| Email   | Robbbie.comer@itt.com |
| Phone   | 703-329-3845     |
| Fax     | 703-329-3841     |

4. Termination.

4.1 Expiration. Except as otherwise provided herein, this Agreement shall expire upon the earliest of: 1) written mutual agreement signed by both parties, or 2) the end of the specific period of performance.

4.2 ITT AES shall have the right, in addition to any other rights set forth in this Agreement, including but not limited to 48 CFR (the "Federal Acquisition Regulation" or "FAR") sections 52.249-2, 52.249-4, 52.249-6 and 52.249-8, to terminate this Agreement in whole or in part upon the occurrence of one or more of the following events:

a) ITT AES may terminate subcontract for convenience only if the Government terminates the work to be performed by subcontractor under ITT AES's prime contract;



b) Subcontractor defaults in performing its obligations under this Subcontract issued hereunder, and fails to cure the default within 10 days (unless extended by ITT AES or within such a period as mutually agreed upon in writing) after receiving a notice specifying the nature of the default. Default includes, but is not limited to, a failure to make progress in the work so as to endanger performance;

c) The entering into or filing by or against the Subcontractor of a petition, arrangement, or proceeding seeking an order for relief under the bankruptcy laws of the United States, a receivership for any of the assets of Subcontractor, an assignment for the benefit of its creditors, or the dissolution, liquidation, or insolvency of Subcontractor.

d) Subcontractor fails to agree upon any deletion, amendment or addition to this Agreement which is required by statute, executive order, applicable regulations, or is as a result of or relating to a modification of the Prime Contract;

e) Subcontractor is sanctioned, suspended, or debarred by the federal government; or

f) Subcontractor has an organizational conflict of interest as defined in FAR Subpart 9.5 that, in the conclusive opinion of ITT AES or the Government, cannot be mitigated.

4.3 In the event that ITT AES exercises its rights under this Termination article, Subcontractor shall continue to perform its obligations hereunder diligently to the extent this Agreement is not terminated.

4.4. Limitation of Funds. The Subcontractor shall notify ITT AES in writing, whenever the costs it expects to incur under this Subcontract with in the next sixty (60) days, in combination with all costs previously incurred, will exceed 75% of the total amount funded to date by ITT AES under an individual Task Order. The notice shall state the estimated amount of additional funds required to continue performance for the period specified in the Task Order, as well as the estimated date that current funding levels will be fully expended. ITT AES is not obligated to reimburse Subcontractor for costs incurred in excess of the total amount awarded under this Subcontract; and the Subcontractor is not obligated to continue performance under this Subcontract or otherwise incur costs in excess of the total amount funded under this Subcontract.

5.  Personnel Requirements.

5.1 Qualified Personnel. Subcontractor shall provide only personnel fully qualified and competent to perform the scope of effort set forth herein.

Subcontractor shall be prepared to provide resumes upon ITT AES's request. In performing this Subcontract, the Subcontractor will not use as a consultant or employee (on either a full or part time basis) any active Government personnel (civilian or military) without the prior approval of the Contractor. Such approval may be given only in circumstances where it is clear no laws, instructions, regulations, or policies might possibly be contravened and no appearance of a conflict of interest will result.

5.2 Transfer and Exchange of Subcontractor Key Personnel. If requested in the Task Order SOW, certain personnel may be designated as Key. The Subcontractor shall provide resumes for the personnel filling any position designated as Key in the Task Order. Subcontractor shall not transfer Key Personnel off of the Task Order without the prior written concurrence of ITT AES's Program Manager. Subcontractor must provide a reasonably detailed explanation of the circumstances necessitating any proposed substitution, a complete resume for the proposed substitute, and any other information requested by ITT AES's Project Manager to approve or disapprove the proposed substitution. All substitutes must have qualifications that are equal to or greater than the qualifications for that labor category. Accordingly, Subcontractor's failure to provide acceptable replacement personnel as directed by ITT AES's Project Manager, or excessive transfer by Subcontractor of Key Personnel off of the Project workforce may be deemed by ITT AES at its discretion, to constitute a material breach of this Agreement and the particular Task Order at issue.

Substitutions for key personnel may be made under the following conditions:

a) The subcontractor shall notify ITT AES at least thirty (30) working days before making changes in personnel.

b) The subcontractor shall provide personnel who meet or exceed the capability of the personnel being replaced.

AES 2006-08



c) Replacement personnel must be approved by ITT AES prior to assignment of the replacement and prior to transfer of the individual. Such approval shall not be unreasonably withheld or delayed by ITT AES. ITT AES will notify Subcontractor of approval or denial promptly after receipt of Government acceptance of replacement personnel resume.

5.3 Review of Resumes. Subcontractor shall furnish all resumes to ITT AES for its review and approval.

5.4 Subcontractor will be responsible for all technical support, data analyses, architectural studies, systems engineering, configuration, modeling, simulation activities performed under the NGA/InnoVision Omnibus contract awarded to ITT that are related to three dimensional laser radar imaging and laser topographic mapping. In the event that ITT requires assistance in the execution of tasks under the NGA/InnoVision Omnibus contract relating to other laser remote sensing technologies, including but not limited to laser spectroscopy and laser vibrometry, then the subcontractor will be the preferred supplier of those services. All personnel and services shall be dependent upon the requirements and approval of the customer.

5.5 Unsatisfactory Performance. After due consultation with Subcontractor, ITT AES may request Subcontractor to remove any employee of Subcontractor whose performance is deemed unacceptable by either ITT AES or the Government, and it shall be the responsibility of Subcontractor if so directed by ITT AES to remove and replace that individual in a timely fashion or within the time frame required by ITT AES or the Government at no additional cost to ITT AES.

5.6 Failure to Respond. If Subcontractor fails to provide qualified personnel within 30 days, ITT AES shall have the right to fill the positions from sources other than Subcontractor. In that event, ITT AES will reduce the number of LOE hours and associated costs allotted to the Subcontractor under applicable Task Order(s) accordingly.

6.   Disputes.

6.1 Disputes Under the Subcontract. The parties shall make a good-faith effort to amicably settle by mutual agreement any dispute that

may arise between them under this Subcontract. Except with respect to issues subject to Article 6.2, any claim, controversy or dispute arising out of or related to this Agreement shall be resolved exclusively in the courts of the Commonwealth of Virginia located in Fairfax County, Virginia. Any judgment issued by such court shall award the prevailing party its reasonable attorneys' fees and related costs.

Both parties agree that the occurrence of a dispute shall not interfere with either party's performance or other obligations under this Agreement.

6.2 Disputes Under the Prime Contract.

a) The Prime Contract includes a disputes clause, FAR 52.233-1 (the "Disputes Clause"), pursuant to which ITT AES may pursue certain procedures in the event of a dispute between the Government and ITT AES with respect to questions of law or fact relating to the Prime Contract. All Subcontractor claims, controversies or disputes concerning matters that reasonably constitute a "Claim" as defined in the Disputes Clause of the Prime Contract shall be governed solely by the provisions of Article 6.2. Subcontractor shall be responsible for providing any and all certifications required by law or regulation relating to matters subject to the Disputes Clause and any and all information requested by ITT AES or the Government to enable ITT AES or the Government to verify, support, or confirm such certifications.

b) In the event ITT AES elects to appeal any Government decision pursuant to the Disputes Clause of the Prime Contract, Subcontractor shall provide ITT AES, at Subcontractor's sole cost and expense, with reasonable assistance in the prosecution of such appeal including, but not limited to, access to applicable Subcontractor documents and personnel, provided, however, that proprietary financial and employee information shall be provided only to the Government.

c) If as a result of a final decision or judgment with respect to a dispute under this Article 6.2, ITT AES is unable to obtain reimbursement under the Prime Contract for, or is required to refund or credit the Government any amount for which ITT AES has reimbursed or paid Subcontractor, Subcontractor shall, on



demand, repay such amounts ("Repayments"). The Subcontractor shall, on demand, remit Repayments to ITT AES within thirty (30) business days from when Subcontractor is notified of such demand in accordance with paragraph B.15, "Notices". Subcontractor shall be liable for all costs expended by ITT AES in collecting such Repayments from Subcontractor, including reasonable attorneys' fees and expenses. Subcontractor also shall be liable for interest on such Repayments that shall begin to accrue on the fortieth (40th) day after Subcontractor is notified of such demand. Such interest shall accrue at three (3) percent above the prime rate published on the effective date of the Repayment demand notice. The rights and obligations herein shall survive the termination of this Subcontract.

d) If ITT AES declines to file a claim under the Disputes Clause, or declines to appeal any ruling on a claim ITT AES has filed, whether at the agency level or at a Board of Contract Appeals or a federal court, and such claim, in whole or in part, arises out of or relates to this Subcontract, Subcontractor may request ITT AES to file such claim or appeal ("sponsor") on behalf of Subcontractor. Subcontractor shall be responsible for all costs and expenses incurred by ITT AES in sponsoring a claim or appeal.

e) Any final decision of the Contracting Officer under the Prime Contract Disputes Clause relating to this Subcontract or Subcontractor's performance hereunder, or any decision or appeal that is not further appealed, shall be conclusive and binding on Subcontractor unless appealed pursuant to Article 6.2 and ITT AES shall notify Subcontractor of any such final decision within twenty (20) days of ITT AES's receipt thereof.

7. Rights to Inventions. Unless otherwise agreed in writing by the parties, any inventions arising during the term of the Agreement shall be the property of the originating party. In the event of joint inventions, the parties shall each have an undivided, one-half interest in and to such jointly developed inventions. If a party files for a patent for any such invention, the other party shall pay one half of all related patent filing and prosecution fees, including attorneys fees, or it shall forfeit its interest in

such invention and patent and shall assign its rights in the invention to the party filing for the patent. The parties agree to abide by provisions in the Prime Contract that may require the parties to grant license or other rights in the inventions and patents and associated data to the Government.

8. Assignment. Subcontractor may not assign or transfer this Agreement or any rights herein, in whole or part, including the obligation of Subcontractor to directly perform the work herein through its employees, without the prior written consent of ITT AES.

9. Conflicts of Interest. Subcontractor represents that its execution and performance of this Agreement does not conflict with or breach any contractual, fiduciary or other duty or obligation to which Subcontractor is bound. Subcontractor further represents that it will not accept work during the term of this Agreement which would create an organizational conflict of interest ("OCI") as such term is defined in FAR Subpart 9.5 and that it will comply with the terms of the Conflict of Interest Clause(s) set forth in Section E, Contract Clauses.

Subcontractor shall immediately provide notice to ITT AES in the event that it discovers any potential, actual or apparent personal or organizational conflict of interest related to or arising from this Agreement. Failure to disclose and adequately avoid or mitigate any OCI shall entitle ITT AES to immediately terminate the affected Task Order.

10. Non-Solicitation. During the term of this Agreement, including extensions or modifications thereto, the parties agree that neither shall directly or indirectly solicit for employment or otherwise seek to induce to leave the employ of the other party any employees of the other assigned to work on Task Orders issued pursuant to this Subcontract, without the prior written agreement of the party whose employee is being considered for employment. This paragraph shall not preclude employees of either party from independently pursuing employment opportunities with the other party, whether on their own initiative or in response to general solicitations, including but not limited to job postings published in newspapers, trade publications or websites.

AES 2006-08



injury. If applicable, Defense Base Act workers' compensation insurance for personnel provided pursuant to this subcontract (including but not limited to: employees, consultants, lower tier subcontractors) performing services overseas in support of the national defense.

The Subcontractor shall provide a certificate executed by an authorized insurer that such insurance is in full force and effect and that ITT AES will be notified thirty days prior to the modification or cancellation of such insurance. The Subcontractor further certifies that it shall continuously maintain such insurance for the duration of this Subcontract.

18. Nondisclosure of Proprietary Information. During the performance of this Agreement certain technical and cost information will be disclosed by one party ("Disclosing Party") to the other party ("Receiving Party") and will be deemed proprietary if marked with a conspicuous legend identifying it as proprietary information ("Proprietary Information"). The Receiving Party will use not less than the same efforts to prevent the disclosure of Proprietary Information received hereunder as is used to protect its own Proprietary Information, in no event, however, will less than a reasonable degree of care be used. Disclosure of Proprietary Information received hereunder shall be restricted to those individuals who are directly participating in the performance of the Subcontract. Proprietary Information shall not include information that is:

a) known to the Receiving Party prior to receipt of such information from the Disclosing Party;

b) independently developed by the Receiving party without the benefit or use of the Proprietary Information furnished by the Disclosing Party;

c) obtained from a third party who, to the knowledge of the Receiving Party, received the Proprietary Information without any restriction on its further disclosure;

d) publicly known through no breach of this Agreement;

e) disclosed by the Disclosing Party to a third party without restriction; or

f) obligated to be disclosed pursuant to applicable law, regulation or legal process, provided that the Receiving Party shall give

the Disclosing Party advance notice and will provide reasonable assistance at the Disclosing Party's expense in contesting such legal process if requested by the Disclosing Party.

This Article 18 shall survive termination of this Agreement for a period of three years.

19. Licenses. Subcontractor shall obtain and maintain in force during the period of the Subcontract, all licenses, agreements and authorizations necessary or appropriate to enable performance of Subcontractor's duties hereunder. If said permits, licenses, agreement and authorizations expire, terminate, are cancelled or are withdrawn, ITT AES may terminate this agreement in accordance with Article 4.2.

20. Prior Written Permission Required For All Subcontracts. Subcontractor shall not subcontract or delegate the services to be performed under this Agreement to another party without the prior written consent of ITT AES.

21. Governing Law. This Subcontract shall be governed by and construed according to the law of Federal Government Contracts. To the extent that Federal Government Contract Law does not resolve a particular issue, the laws of the Commonwealth of Virginia shall apply, exclusive of that body of laws known as conflicts of law.

22. Order of Precedence. In the event of ambiguity, inconsistency, or conflict between or among the provisions of the Agreement, the inconsistency, ambiguity or conflict shall be resolved by giving precedence in the following order:

a) Section A-Parties and Services, B-Terms and Conditions, C-Pricing and Payment, D-Special Provisions

b) Task Order specific Terms and Conditions

c) Task Order Statement of Work

d) Attachment F. 1-Representations and Certifications

e) Section E-Contract Clauses

23. Construction of Agreement. Subcontractor acknowledges that it has read and requested any and all modifications to this Agreement that are needed to express the known intent of the parties. Accordingly, the rule of contra preferendum shall not apply to this

AES 2006-08

Agreement and Subcontractor agrees and acknowledges that any ambiguity, inconsistency or conflict that remains in the Agreement after its execution by both parties shall not be construed for or against either party.

24. **Code of Ethics.** Subcontractor shall have a Code of Ethics, or shall certify to complying with ITT AES's Code of Conduct, addressing at least the following areas: accurate time records and reporting; gifts and entertainment to Government customers; hiring of former government employees; protection of Government proprietary and source selection information; extending and receiving business courtesies; and personal and organization conflicts of interest. Subcontractor also shall have an Ethics Compliance Program, components of which include training and annual compliance certifications by employees.

25. **Closeout Requirements.** Subcontractor will provide all documentation necessary for the timely closeout of this Agreement including the submission of a "Final Invoice", a "Release of Claims", "Assignment of Refunds", and other closeout documents as may be required. If requested by ITT AES, the Subcontractor agrees to close out this Subcontract in accordance with the quick-closeout procedures as defined in FAR 42.708. In the event that it is subsequently determined through audit, investigation, or otherwise, that Subcontractor was paid under this Agreement for unallowable or other improper amounts, Subcontractor agrees to reimburse ITT AES for such amounts and to promptly pay any penalties or other expenses resulting therefrom ("Repayments"). Subcontractor shall, on demand, repay such amounts to ITT AES within thirty (30) business days from when Subcontractor is notified of such demand in accordance with paragraph B.15, "Notices". Subcontractor shall be liable for all reasonable costs expended by ITT AES in collecting such Repayments from Subcontractor, including reasonable attorneys' fees and expenses. Subcontractor also shall be liable for interest on such Repayments that shall begin to accrue on the fortieth (40th) day after Subcontractor is notified of such demand. Such interest shall accrue at three (3) percent above the prime rate published on the effective date of the Repayment demand

notice. The rights and obligations herein shall survive the termination of this Subcontract.

Subcontractor agrees to invoice all labor and non-labor costs, for cost reimbursable type contracts (including Time and Materials), within three months after subcontract period of performance end date. Subcontractor's "Final" invoice shall only contain costs associated with indirect rate variances and any applicable fee withheld (Cost plus fixed fee). Should any labor or non-labor costs be included in the "Final" invoice for a cost reimbursable type subcontract, payment may be delayed due to the time required to verify such costs or denied if such costs cannot be verified. The Subcontractor shall clearly mark the final invoice as "Final".

26. **Subcontracting Plan.** In the event the total value of this Subcontract shall exceed $500,000 then the Subcontractor shall submit and negotiate a Small Business Subcontracting Plan pursuant to 48 CFR 52.219-9. This clause is not applicable to small businesses.

27. **Option to Extend.** ITT AES will continue to utilize the subcontractor as detailed in paragraph 5.4 for all option periods as long as performance is acceptable to the government. Performance rendered by Subcontractor to date has been acceptable.

    Option Periods not yet exercised:
    Base Period Option: 4/1/07 - 11/30/07
    Opt Period 1: 12/1/07 - 11/30/08
    Opt Period 2: 12/1/08 - 11/30/09
    Opt Period 3: 12/1/09 - 11/30/10
    Opt Period 4: 12/1/10 - 11/30/11.

28. **Communication.** All communication with the Government on issues of a contractual or programmatic nature shall be through ITT AES. ITT AES shall be the sole interface with the Government for all issues relating to this Subcontract

29. **Section 508 Accessibility Compliance.** The Subcontractor shall comply with any particular Section 508 requirements contained in Task Orders issued pursuant to this Subcontract.

    A general description of Section 508 accessibility requirements as they pertain to the delivery of Electronic and Information

AES 2006-08



Technology (EIT) can be found at:
http://www.section508.gov

30. Entire Agreement. This Agreement is the entire Agreement between the parties and supersedes any and all prior oral and written agreements, commitments, understandings or communications with respect to the subject matter of this Agreement. This

Agreement may not be modified except in writing, signed by a duly authorized representative of each party.



## SECTION C - PRICING AND PAYMENT

1. **Supplies/Services and Prices.** All work to be performed under this Subcontract will be specifically authorized by ITT AES in writing by issuance of a Task Order. Work performed without written authorization will be performed at the Subcontractor's own risk.

Supplies/Services and prices will be specified in individual Task Orders issued hereunder. As applicable, all hourly rates are inclusive of all salary, benefits, taxes, administration, overhead, and profit.

2. **Use of Job Shop Labor**

2.1 All Subcontractor personnel supporting this Subcontract shall record their direct labor hours in ITT's Job Shop Labor (JSL) system.

2.2 Subcontractor must complete the Job Shop Labor Form (hereinafter referred to as "JSL form") for each Subcontractor employee charging time under the Subcontract. The JSL Form is provided separately.

Subcontractor must complete the JSL Form whenever a personnel change occurs (e.g., name change, termination, new hourly rate) or when a new employee starts.

2.3 Once a Subcontractor employee is entered into the JSL system, ITT will notify Subcontractor. The notification will include the start date for entering hours into e-time, as well as instructions for using e-time. ITT will provide training for Subcontractor personnel on the e-time system.

2.4 Subcontractor personnel will receive a user name and password for accessing e-time. The e-time system is Internet-based and can be accessed wherever the employee has access to the Internet.

2.7 Subcontractor personnel will enter any hours worked on a daily basis, and submit the JSL timecard weekly, as applicable. JSL will only be used for entering hours worked against this Subcontract; hours for vacation, sick leave or other non-Subcontract activities must not be entered into JSL.

Subcontractor personnel must submit their timecards for approval by 12:00 p.m. each Friday. If a timecard is rejected by the ITT task lead, the employee must correct the rejected timecard and resubmit for approval by no later than 2:00 p.m. on that Friday.

2.8 Subcontractor personnel must adhere to the ITT Timekeeping Policy for Subcontractors. A copy of this policy (and any subsequent updates) shall be provided under separate cover.

2.9 Labor data in support of each claim shall be maintained in such a manner as to be readily available and accessible for quarterly reconciliation and/or audit verification by ITT AES or mutually agreed upon representative.

3. **Payment for Labor Costs**

ITT shall pay the Subcontractor upon the submission of proper timecards approved by ITT as follows:

(i) Hourly Rate. The amounts shall be computed by multiplying the appropriate hourly rates from the JSL Form by the number of direct labor hours performed.

(ii) Subcontractor will be paid based on the weekly timecards submitted by its employees and approved by ITT. The "invoice" date for purposes of payment will be the Friday at the end of each timecard period.

4. **Submission of Non-Labor Invoices/Billing**

4.1. Subcontractor may submit an invoice not more frequently than monthly for those charges not recorded via the JSL system. The Subcontractor will send an invoice, broken out by Task Order, to the address provided in Clause C.4.3. All invoices must be certified as true and accurate.

Invoices shall be submitted on official company letterhead with detailed costs:

a) Invoices shall contain at a minimum:

- Subcontract Number
- PO Number
- Subcontract Task Order Number
- Prime Contract Number
- A description of work performed;
- Travel and per diem charges;
- Total other direct costs (ODCs);
- Total invoice amount.
- Totals will also be provided for current charges, Task Cumulative Incurred-to-Date and Cumulative Contract-to-Date charges.

AES 2006-08



11. **Severability.** If any provision of this Agreement is held invalid, void or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement nevertheless will continue in full force and effect without being impaired or invalidated in any way.

12. **Compliance with Laws.** Each party agrees to conduct its business in compliance with all relevant state, local and federal laws and regulations and in such a manner that the name of the other party will not be discredited. Any party breaching this provision shall indemnify the other party for all damages, costs, liabilities and expenses (including attorneys' fees) resulting from such breach, without regard to the limitation of liability set forth in Article 16 of this section.

13. **Publicity.** ITT AES has the right to make this Agreement known to the Government. However, Subcontractor is not authorized to make this Agreement known to any third party, through advertisement or otherwise, without the prior written consent of ITT AES.

14. **No Waiver.** ITT AES's delay or failure to require performance by the Subcontractor of any term, condition or provision hereof shall not affect ITT AES's right to require such performance at any time thereafter; nor shall the waiver by ITT AES of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

15. **Notices.** Any and all notices required or permitted under this Agreement shall be addressed to the attention of the Contracts points of contact identified above in Section B.3, shall be in writing and shall be deemed effective when personally delivered; three (3) days after being sent by Certified U.S. Mail, postage pre-paid, Return Receipt Requested; when sent via electronic fax with confirmation of successful transmission; or when sent by a nationally recognized delivery service providing receipt of delivery.

16. **LIMITATION OF LIABILITY.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY LOST PROFITS, LOST SAVINGS, CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. DIRECT DAMAGES NOT LIMITED BY THIS CLAUSE INCLUDE BUT ARE NOT LIMITED TO (I) ANY CLAIM FOR REPROCUREMENT COSTS; (II) ANY CLAIM FOR "OFFSET" BROUGHT PURSUANT TO THE PROVISIONS OF THE FEDERAL ACQUISITION REGULATIONS, AND (III) ANY CLAIM FOR ADMINISTRATIVE OR CIVIL FALSE CLAIMS REMEDIES.

17. **Indemnification and Insurance**

17.1 The employees of each party shall obey all pertinent rules, regulations and laws while on the premises of the other party. Each party agrees to defend, indemnify and hold harmless the other party from and against any and all claims for: (a) damage to, or the loss of use of, the other party's personal property; and (b) injury or death caused by any act or omission of the indemnifying party's employees, consultants or agents in connection with performance of this Agreement. This indemnification shall survive the termination of this Agreement.

17.2 Subcontractor shall defend, indemnify and hold harmless ITT AES from and against any and all liabilities, losses, damages, costs, credits, penalties or charges, including reasonable attorneys fees, suffered or incurred by ITT AES as a result of (i) any claims, suits, proceedings, audits, investigations, or other actions brought against ITT AES, its agents, employees, representatives, or subcontractors arising out of or related to the negligent performance of Subcontractor, its agents, employees, representatives, or subcontractors under or certifications made pursuant to this Agreement; or (ii) any failure by Subcontractor to comply fully with any laws and regulations, whether or not the same are specifically referenced in this Agreement.

17.3 In addition to the insurance requirements set forth in FAR 52.228-5, 52.228-7 and other clauses incorporated into this Agreement by reference, Subcontractor shall have the following types of insurance and shall maintain them in the amounts shown during the term of this Agreement:

a) Comprehensive General Liability: $1,000,000 for each occurrence and $2,000,000 aggregate per project.

b) Automobile Insurance: $1,000,000 for liability coverage and $1,000,000 for personal injury.

c) Workers' Compensation and Employer's Liability Coverage: $1,000,000 for bodily

AES 2006-08



Subcontractor will be reimbursed only for appropriately authorized expenditures presented via a properly documented invoice.

4.2 Subcontractor shall maintain copies of Subcontractor paid invoices, receipts, travel vouchers (including receipts for common carrier tickets, hotels, and any individual item over $25), to support charges other than personnel-hours. Other non-travel related direct costs (ODCs) which were not included in a list of itemized ODCs in a priced task, must be approved in advance.

4.3 Subcontractor non-labor invoices shall be submitted to the following address:

ITT AES
ATTN: Tammy Enright
PO Box 2160
Reston, VA 20195

Alternatively, invoices may be submitted electronically to invoices.aes@itt.com

5. Payment. ITT AES shall pay Subcontractor's properly submitted non-labor invoice within 45 days of receipt.



## SECTION D – SPECIAL PROVISIONS

1.  Packaging and Marking

1.1 General: At a minimum, the following paragraphs shall be applicable to all Task Orders issued under this Subcontract. Additional requirements may be specified in each Task Order.

1.2 Packaging: The Subcontractor shall ensure that all items are preserved, packaged, packed and marked in accordance with best commercial practices to meet the packing requirements of the carrier and to ensure safe and timely delivery at the intended destination.

1.3 Marking: All data and correspondence shall reference:

a) Subcontract Number and Subcontract Task Order Number

b) Applicable Government Prime Contract Number and Prime Task Order Number

1.4 Container Marking: Containers shall be clearly marked as follows:

a) Name of Prime Contractor and Subcontractor

b) Prime Contract No. and Subcontract No.

c) Subcontract Task Order Number and Government Prime Task Order Number

d) Description of Item contained herein

e) Consignee's name and address.

2.  Inspection and Acceptance

2.1 General: At a minimum the following paragraphs shall be applicable to all Task Orders issued under this Subcontract. Additional inspection and acceptance requirements may be specified in each Task Order. All deliverables will be submitted to the Manager identified in each Task Order.

2.2 Place of Inspection and Acceptance:

a) Inspection and acceptance of all work performance reports and other deliverables under this Subcontract shall be performed at the place of delivery.

b) The Inspection of Services/Inspection of Supplies FAR clauses specified in Section E are applicable to work sites specified in individual Task Orders.

2.3 Scope of Inspection: The Task Order Manager and the Government will inspect all deliverables

for content, completeness, and accuracy and conformance to Task Order requirements. Inspection may include validation of information or software through the use of automated tools and/or testing of the deliverables, as specified in the Task Order. The scope and nature of this testing must be negotiated prior to Task Order award and will be sufficiently comprehensive to ensure the completeness, quality and adequacy of all deliverables.

2.4 Basis of Acceptance: The basis for acceptance shall be compliance with the requirements set forth in the Task Order, the Subcontractor's proposal and other terms and conditions of this Subcontract. Acceptance by the Task Order Manager shall not be final until an authorized Government representative has also accepted the goods and/or services tendered. Deliverable items rejected under any resulting Task Order shall be corrected in accordance with ITT AES's direction.

2.5 Access to Records, Data and Facilities: With ten (10) days prior notification, the Subcontractor shall permit ITT AES and/or the Government access at any reasonable time to all records, data and facilities used in the performance of the supplies and services.

3.  Deliverables

3.1 Place of Delivery: The products and services required under the Subcontract shall be completed and delivered in accordance with the delivery dates and locations contained in the individual Task Orders.

3.2 Delivery Schedule: The products and services required under the Subcontract shall be completed and delivered in accordance with the delivery schedule specified in the individual Task Orders.

3.3 Monthly Status Report (MSR): Subcontractor shall coordinate with the GeoSage Task Monitor regarding the submission of status reports for each Task Order issued by ITT AES. Schedule, content and format requirements for MSR narrative shall be provided by the Task Monitor or in an addendum to this Agreement.

3.4 JSL Reconciliation Reports: The subcontractor shall provide the Prime at the end of each option period a report certifying the amount of hours billed to ITT's JSL Timekeeping System.



### 4.   Other Provisions

#### 4.1 Travel:

a) Official travel of Subcontractor personnel away from their duty station, which was not identified in the negotiated Task Order, shall not be undertaken unless advance, prior written approval has been obtained from ITT AES.

b) The Subcontractor's request for travel shall be in writing and contain the dates, locations, and estimated costs of the travel.

c) Costs associated with the Subcontractor's travel shall be in accordance with FAR Part 31.205-46.

d) The Contractor shall not be reimbursed for the following daily local travel costs:

(i) Travel at U.S. Military Installations where Government transportation is available,

(ii) Travel performed for personal convenience/errands, including commuting to and from work, and

(iii) Travel costs incurred in the replacement of personnel when such replacement is accomplished for the Contractor's or employee's convenience.

#### 4.2 Work on a Government Site: In performing work under this contract on a Government Installation or in a Government building, the Subcontractor shall fully comply with local military installation, city, state and federal laws, regulations and/or ordinances pertinent to performance of the contractual services required under this Subcontract. Specifically, the Subcontractor shall: Conform to the specific safety requirements established by this contract.

a) The Subcontractor and its employees shall observe all rules  and  regulations issued by the installation's Senior Official pertaining to fire, safety, sanitation, severe weather, admission to the installation, conduct not directly addressed in this Subcontract.

b) Take all reasonable steps and precautions to prevent accidents and preserve the life and health of Subcontractor, Prime Contractor, and Government personnel connected in any way with performance under this Subcontract.

c) Take such additional immediate precautions as the Government may reasonably require for safety and accident prevention purposes.

d) Conform to all security requirements as specified in each Task Order.

#### 4.3 Security: This document is unclassified; however, the classification of the work to be performed on specific Task Orders issued under this Subcontract requires security clearances in accordance with the SOW. The Subcontractor shall adhere to the security requirements identified in the SOW and other guidance that may be established by ITT AES and the Government.

#### 4.4 Special Terms and Conditions: Special terms and conditions distinct to a Task Order may be incorporated into a Task Order as necessary.

AES 2006-08



## SECTION E – CONTRACT GLAUSES

This Subcontract incorporates by reference the following clauses listed below with the same force and effect as if they were given in full text. The full text of a clause may be accessed electronically at http://farsite.hill.af.mil/, or may be reviewed in full text in the precedent RFP 2006-K-0020. In all such clauses, unless the context of the clause requires otherwise, the term "Contractor" shall mean Subcontractor, the term "Contract" shall mean this Subcontract, and the terms "Government" and "Government Contracting Officer" and equivalent phrases shall mean ITT and ITT's Subcontract Administrator, respectively. It is intended that the referenced clauses shall apply to Subcontractor in such manner as is necessary to reflect the position of Subcontractor as a subcontractor to ITT, to ensure Subcontractor's obligations to ITT and to the United States Government, and to enable ITT to meet its obligations under its Prime Contract.

| RFP Clause | Clause Reference | Short Title | Date |
|---|---|---|---|
| D-1 | 152.247-701 | Identification and Marking of Shipments | MAR 2004 |
| E-1 | 52.252-2 | Clauses Incorporated by Reference | FEB 1998 |
| | 52.246-5 | Inspection of Services – Cost-Reimbursement | APR 1984 |
| | 52.246-8 | Inspection of Research and Development Cost-Reimbursement | MAY 2001 |
| E-2 | 152.215-718 | Testing Related to Electronic Communication Equipment | APR 1984 |
| E-3 | 152.246-701 | Certificate of Conformance | MAR 2004 |
| E-4 | 152.246-702 | Inspection and Acceptance at Destination | MAR 2004 |
| E-5 | 152.246-703 | Inspection and Acceptance Test Procedures | APR 1984 |
| F-1 | 52.242-15 | Stop-Work Order (Aug 1989) – Alternate I | APR 1984 |
| | 52.247-34 | F.O.B. Destination | NOV 1991 |
| H-1 | 152.201-702 | Fraud, Waste and Abuse … | DEC 2002 |
| H-3 | 152.204-701 | Security Requirements – General | SEP 2004 |
| H-4 | 152.204-702 | Security Requirements – Clearances | AUG 2005 |
| H-5 | 152.204-703 | Non-Publicity | DEC 2003 |
| H-6 | 152.204-704 | Request for Clause Waiver…. | JUL 1997 |
| H-7 | 152.204-705 | Foreign Ownership, Control, or Influence | SEP 2002 |
| H-8 | 152.204-706 | Security Requirements – Software Certification | JUN 1998 |
| H-9 | 152.204-710 | Security Requirements – Program | SEP 2002 |
| H-11 | 152.204-712 | Personal Conduct | JUL 1997 |
| H-12 | 152.204-719 | Notification of Issuance of Classified Subcontracts (* RFP contains JAN 2003 version; JAN 2006 includes additional description of SubK.) Mandatory flowdown, but no 2nd tier subcontracting is authorized. | JAN 2006* |
| H-13 | 152.204-722 | Reporting & Training Requirements… *RFP contains SEP 2002 version.  APR 2006 replaced (a) in its entirety as follows: "(a) Financial Disclosure. A Financial Disclosure Form must be completed by the cleared individual within 30 days of approval date and then every two years depending upon their last name in accordance with Agency direction." | APR 2006* |

AES 2006-08



| RFP Clause | Clause Reference | Short Title | Date |
|---|---|---|---|
| H-14 | 152.204-723 | Prohibition against Recruiting in Agency Facilities | AUG 2004 |
| H-15 | 152.211-703 | Usage of the Metric System of Measurement | OCT 2003 |
| H-21 | 152.231-702 | Mission Sensitive Travel... | JAN 2004 |
| H-23 | 15152.2.2231-707 | Early Dismissal and Closure of Government Facilities | JAN 2004 |
| H-25 | 152.242-716 | Past Performance Information – Referencing Agency Contracts | MAR 2004 |
| H-29 | 5X52.227-9000 | Unauthorized Use of NGA Name, Seal, and Initials | undated |
| H-30 | Full text | Performance of Work on Government Premises | undated |
| H-31 | Full text | Working Hours | undated |
| H-32 | Full text | Identification Badges | undated |
| H-33 | Full text | Distribution Control of Technical Information | undated |
| I-1 | 52.202-1 | Definitions | JUL 2004 |
| | 52.203-3 | Gratuities | APR 1984 |
| | 52.203-6 | Restrictions on Subcontractor Sales to the Government | JUL 1995 |
| | 52.203-7 | Anti-Kickback Procedures | JUL 1995 |
| | 52.203-10 | Price or Fee Adjustment for Illegal or Improper Activity | JAN 1997 |
| | 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions | JUN 2003 |
| | 52.204-4 | Printed or Copied Double-Sided on Recycled Paper | AUG 2000 |
| | 52.211-15 | Defense Priority and Allocation Requirements | SEP 1990 |
| | 52.215-10 | Price Reduction for Defective Cost or Pricing Data | OCT 1997 |
| | 52.215-12 | Subcontractor Cost or Pricing Data | OCT 1997 |
| | 52.215-14 | Integrity of Unit Prices | OCT 1997 |
| | 52.215-15 | Pension Adjustments and Asset Reversions | OCT 2004 |
| | 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other Than Pensions | OCT 1997 |
| | 52.215-21 | Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data – Modifications | OCT 1997 |
| | 52.219-8 | Utilization of Small Business Concerns | MAY 2004 |
| | 52.219-9 | Small Business Subcontracting Plan | JAN 2002 |
| | 52.219-16 | Liquidated Damages - Subcontracting Plan | JAN 1999 |
| | 52.222-1 | Notice to the Government of Labor Disputes | FEB 1997 |
| | 52.222-3 | Convict Labor | JUN 2003 |
| | 52.222-21 | Prohibition of Segregated Facilities | FEB 1999 |
| | 52.222-26 | Equal Opportunity | APR 2002 |
| | 52.222-29 | Notification of Visa Denial | JUN 2003 |
| | 52.222-35 | Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans | DEC 2001 |
| | 52.222-36 | Affirmative Action for Workers with Disabilities | JUN 1998 |
| | 52.222-37 | Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans | DEC 2001 |
| | 52.223-3 | Hazardous Material Identification and Material Safety Data | JAN 1997 |
| | 52.223-5 | Pollution Prevention and Right-to-Know Information | AUG 2003 |
| | 52.223-6 | Drug-Free Workplace | MAY 2001 |
| | 52.223-10 | Waste Reduction Program | AUG 2000 |
| | 52.223-14 | Toxic Chemical Release Reporting | AUG 2003 |
| | 52.224-1 | Privacy Act Notification | APR 1984 |

AES 2006-08



| RFP Clause | Clause Reference | Short Title | Date |
|---|---|---|---|
| | 52.224-2 | Privacy Act | APR 1984 |
| | 52.225-1 | Buy American Act – Supplies | JUN 2003 |
| | 52.225-13 | Restrictions on Certain Foreign Purchases | MAR 2005 |
| | 52.227-1 | Authorization and Consent (JUL 1995) Alternate 1 | APR 1984 |
| | 52.227-2 | Notice and Assistance Regarding Patent and Copyright Infringement | AUG 1996 |
| | 52.227-10 | Filing of Patent Applications - Classified Subject Matter | APR 1984 |
| | 52.227-12 | Patent Rights-Retention by the Contractor (Long Form) | JAN 1997 |
| | 52.227-14 | Rights in Data – General | JUN 1987 |
| | 52.227-14 | Rights in Data - General (JUN 1987) - Alternate II | JUN 1987 |
| | 52.228-3 | Workers' Compensation Insurance (Defense Base Act) | APR 1984 |
| | 52.228-7 | Insurance - Liability to Third Persons | MAR 1996 |
| | 52.230-2 | Cost Accounting Standards | APR 1998 |
| | 52.230-3 | Disclosure and Consistency of Cost Accounting Practices | APR 1998 |
| | 52.230-5 | Cost Accounting Standards - Educational Institution | APR 1998 |
| | 52.230-6 | Administration of Cost Accounting Standards | APR 2005 |
| | 52.232-17 | Interest | JUN 1996 |
| | 52.232-22 | Limitation of Funds | APR 1984 |
| | 52.233-4 | Applicable Law for Breach of Contract Claim | OCT 2004 |
| | 52.237-2 | Protection of Government Buildings, Equipment, and Vegetation. | APR 1984 |
| | 52.237-3 | Continuity of Services. | JAN 1991 |
| | 52.239-1 | Privacy or Security Safeguards | AUG 1996 |
| | 52.242-3 | Penalties for Unallowable Costs | MAY 2001 |
| | 52.242-4 | Certification of Final Indirect Costs | JAN 1997 |
| | 52.242-12 | Report of Shipment (REPSHIP) | JUN 2003 |
| | 52.242-13 | Bankruptcy | JUL 1995 |
| | 52.243-2 | Changes - Cost Reimbursement (AUG 1987) Alt V | AUG 1984 |
| | 52.243-6 | Change Order Accounting | APR 1984 |
| | 52.244-6 | Subcontracts for Commercial Items | DEC 2004 |
| | 52.245-1 | Property Records | APR 1984 |
| | 52.245-5 | Government Property (Cost-Reimbursement. Time-and-Material, or Labor-Hour Contracts) | MAY 2004 |
| | 52.245-19 | Government Property Furnished "As Is" | APR 1984 |
| | 52.246-23 | Limitation of Liability | FEB 1997 |
| | 52.247-1 | Commercial Bill of Lading Notations | APR 1984 |
| | 52.249-6 | Termination (Cost-Reimbursement) | MAY 2004 |
| | 52.249-14 | Excusable Delays | APR 1984 |
| | 52.251-1 | Government Supply Sources | APR 1984 |
| | 52.253-1 | Computer Generated Forms | JAN 1991 |
| I-5 | 52.222-2 | Payment For Overtime Premiums. [Insert 0%] | JUL 1990 |
| I-7 | 52.229-8 | Taxes - Foreign Cost-Reimbursement Contracts. | MAR 1990 |
| I-12 | 152.203-700 | Compliance With The Constitution And Statutes Of The United States | AUG 1996 |
| I-13 | 152.209-701 | Organizational Conflicts Of Interest: General | JUL 2003 |
| I-15 | 152209-704 | Protection Of Information | JUL 2003 |
| I-17 | 152.209-708 | Suspension and Debarment | AUG 2004 |

AES 2006-08



| RFP Clause | Clause Reference | Short Title | Date |
|---|---|---|---|
| I-18 | 152.215-700 | Audit And Records Negotiation | AUG 2004 |
| I-19 | 152.215-717 | Timely Notice Of Litigation | AUG 1996 |
| I-20 | 152.215-720 | Intention To Use Consultants | AUG 1996 |
| I-21 | 152.215-727 | Pricing Adjustment | OCT 2003 |
| I-22 | 152.222-700 | Equal Employment Opportunity | JAN 2004 |
| I-23 | 152.222-701 | Work Hours and Safety Standards Act — Overtime Compensation | JAN 2004 |
| I-24 | 152.223-702 | Hazardous Waste Liability and Indemnification | JAN 2004 |
| I-25 | 152.223-704 | Workplace Health and Safety | JAN 2004 |
| I-26 | 152.223-705 | Accident Reporting | JAN 2004 |
| I-27 | 152.227-700 | Patent Rights – Retention by the Contractor | JAN 2004 |
| I-28 | 152.227-701 | Special Intellectual Property Provision – Rights in Data Developed with Mixed Funding | NOV 2004 |
| I-29 | 152.227-7030 | Technical Data Withholding of Payment | JAN 2004 |
| I-30 | 152.228-701 | Workers Compensation Insurance (Defense Base Act) *Rates have changed. | JUL 2006* |
| I-31 | 152.228-7002 | Aircraft Flight Risk | JAN 2004 |
| I-32 | 152.229-700 | Tax Audits | JAN 2004 |
| I-34 | 152.242-717 | Contractor Personnel Supervision | DEC 2001 |
| I-35 | 152.245-712 | Agency Alternative to FAR 52.245-5 | MAR 2004 |
| I-36 | 152.252-700 | Clauses Requiring Access by other Government Entities | JUL 2003 |
| I-37 | 252.245-7000 | Government Furnished Mapping, Charting and Geodesy Property | DEC 1991 |

AES 2006-08



## SECTION F – ATTACHMENTS

1. Representations and Certifications
2. Job Shop Labor Form
3. GeoSage Pre-Authorization Travel Form
4. ITT's Timekeeping Policy

AES 2006-08

COMMONWEALTH OF VIRGINIA
## *CIRCUIT COURT OF FAIRFAX COUNTY*
4110 CHAIN BRIDGE ROAD
FAIRFAX, VIRGINIA 22030
703-691-7320
(Press 3, Press 1)

*Fastmetrix Inc vs. ITT Corporation*

CL-2011-0010047

**TO:**   ITT Corporation
Serve: CT Corporation System RA
4701 Cox Road Suite 301
Glen Allen VA 23060

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

### APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.

Done in the name of the Commonwealth of Virginia, on Tuesday, July 12, 2011.

JOHN T. FREY, CLERK

By: _____
Deputy Clerk

**Plaintiff's Attorney**  Scott A. Surovell

 **CT Corporation**

**Service of Process Transmittal**
07/18/2011
CT Log Number 518843859

TO:  Burt Fealing, Corporate Secretary
ITT Corporation
1133 Westchester Avenue
White Plains, NY 10604

RE:  **Process Served in Virginia**

FOR:  ITT Corporation (Domestic State: IN)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Fastmetrix, Inc., Pltf. vs. ITT Corporation, Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Exhibits, Interrogatories, Request for Production of Documents |
| **COURT/AGENCY:** | Fairfax County Circuit Court, VA<br>Case # CL20110010047 |
| **NATURE OF ACTION:** | Alleges breach of contract of fiduciary duty - Seeking in excess of $1,000,000.00 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Glen Allen, VA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/18/2011 at 09:15 |
| **JURISDICTION SERVED :** | Virginia |
| **APPEARANCE OR ANSWER DUE:** | Within 21 days after service - Answer // Within 28 days after service - Interrogatories/Production |
| **ATTORNEY(S) / SENDER(S):** | Scott A. Surovell<br>Surovell Isaacs Petersen & Levy PLC<br>4010 University Drive<br>Suite 200<br>Fairfax, VA 22030<br>703-251-5400 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/18/2011, Expected Purge Date: 07/23/2011<br>Image SOP<br>Email Notification, Robin Cohen robin.cohen@itt.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:** | C T Corporation System<br>Tinika Baylor<br>4701 Cox Road<br>Suite 301<br>Glen Allen, VA 23060 |
| **TELEPHONE:** | 804-217-7255 |

Page 1 of 1 / JG

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.